Kyle E. Hart (MN Atty ID 159025)
Theodore V. Roberts (MN Atty ID 31318X)
**FABYANSKE, WESTRA, HART & THOMSON, P.A.**
800 LaSalle Ave. S., Suite 1900
Minneapolis, MN 55402
(612) 359-7600
troberts@fwhtlaw.com

Brad Holm (01521)
**HOLM WRIGHT HYDE & HAYS PLC**
10429 South 51st Street, Suite 285
Phoenix, Arizona  85044
(480) 961-0040
bholm@holmwright.com

Attorneys for plaintiff Southeast Directional Drilling, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| Southeast Directional Drilling, LLC, a Minnesota limited liability company,<br><br>         Plaintiff,<br><br>v.<br><br>Kern River Gas Transmission Company, a Texas general partnership; and Barnard Pipeline, Inc., a Montana corporation,<br><br>         Defendants | Case no. 2:11-cv-01035-DB<br><br>**SECOND AMENDED COMPLAINT**<br><br><br><br>**(Jury Trial Demanded)** |

Plaintiff Southeast Directional Drilling, LLC (SEDD) complains against defendants Kern River Gas Transmission Company, a Texas general partnership, and Barnard Pipeline, Inc., a Montana corporation, as follows.

## Parties, Jurisdiction, and Venue

1.   SEDD is a Minnesota limited liability company. SEDD's sole member is a Minnesota corporation whose principal place of business is in Casa Grande, Arizona.

2.   Defendant Kern River Gas Transmission Company (Kern River) is a Texas general partnership doing business in Utah.

3.   Defendant Barnard Pipeline, Inc. (Barnard) is a Montana corporation. Barnard's registered agent is:

>    Marty L. Jorgenson
>    701 Gold Street
>    PO Box 362
>    Bozeman, Montana  59771-0362

4.   The Court has jurisdiction of this case under 28 U.S.C. § 1332(a). The parties are incorporated in different states, and their principal places of business are in different states. The amount in controversy exceeds $75,000.

5.   The Court has personal jurisdiction over defendants because both of them conduct business in Utah, and the conduct on which SEDD's claims are based occurred in Utah.

6.   Venue is proper in this district under 28 U.S.C. 1391(a) because a substantial part of the events or omissions giving rise to SEDD's claims occurred in the district.

## Background on Horizontal Directional Drilling

7.   Horizontal directional drilling is an alternative method for drilling and installing conduit and pipeline beneath obstructions such as roadways, river and stream beds, and

other areas that warrant specialized attention (*e.g.*, environmentally sensitive or archeologically significant sites).

8. Unlike open-trench construction, the HDD process allows for installation of a pipeline with a minimum of excavation. This provides an efficient method for crossing obstacles that cannot easily be removed or excavated (*e.g.*, highways, rail tracks, or airfield runways).

9. SEDD is an established HDD drilling contractor with a proven track record of successful projects, inside and outside of the United States. Its management team has a combined field experience of over 100 years in pipelining and directional drilling. SEDD has completed several hundred bores, including bores that set records at the time for length, size, and depth. SEDD's accomplishments have been discussed in industry journals, including Trenchless Technology International.

10. Pipeline installation by HDD is usually accomplished in three stages. The first stage involves directionally drilling a small-diameter pilot hole along a designed drill path traveling from an entry point on one side of an obstacle (*e.g.*, a river) to the exit point on the other.

11. In the second stage, the pilot hole is enlarged as necessary through successive passes with progressively larger drill bits—known as hole cutters, cutting assemblies, or reamers—until the desired diameter is obtained. The bore-hole's final diameter must be

larger than the product pipe's diameter in order to reduce friction associated with pulling the pipe back and to facilitate the flow of drilling fluids around the pipeline.

12. During drilling, the contractor is constantly pumping drilling mud into the hole under pressure to support the walls of the hole against collapse while filtering debris created by the drilling process out of the hole.

13. In the third stage of the process, the drilling equipment is used to pull the pipeline through the hole. The pipeline is then installed and put into service.

14. A project's subsurface conditions are critical to success or failure of an HDD project. An HDD project must be performed almost exclusively underground, and an important consideration is the composition of the subsurface material and conditions through which the bore-hole will be drilled and the pipe pulled. Subsurface conditions are a major factor affecting both the feasibility and cost of an HDD project.

15. HDD through gravel, boulders, underground voids, and aquifers—including artesian conditions and flowing water—or through other unusual hydrogeological conditions, presents extraordinary difficulties, which may result in the driller's failure to complete the crossing.

16. Accordingly, a project's *anticipated* subsurface conditions directly affect how a contractor will bid a project, directly impacting the project owner's costs for the work.

## General Allegations

17. Barnard contracted with Kern River to complete Kern River's "Apex Expansion Project—Wasatch Loop Pipeline Project." This work included a number of HDD bores or crossings.

18. Kern River prepared contract documents for the project, including geotechnical information about the project's subsurface conditions.

19. Using Kern River's contract documents, Barnard solicited SEDD's proposal to perform a number of HDD crossings. The contract documents included a geotechnical report about the project's subsurface conditions.

20. The contract documents did not indicate that SEDD would be forced to drill through subterranean groundwater flow, an earthquake fault like, or other unusual hydrogeological conditions.

21. A contractor's obligation, if any, to conduct a site visit does not require the contractor to engage in an expensive, time-consuming exploration of project subsurface conditions.

22. Specifically, during a site visit the HDD contractor would verify that the allotted space for the work is suitable for drilling and other equipment, check the availability of water, and evaluate other factors that affect the work (*e.g.*, the presence of environmentally sensitive areas near the project, the parameters of right-of-ways, and the

quality of access roads to the project). This is a *visual* inspection of the site itself, **not a subsurface investigation**.

23. According to Barnard's solicitation, SEDD was under no obligation—and was not given the time—to incur the significant expense of independently ascertaining actual subsurface conditions or verifying the project geotechnical report and other subsurface information provided by Barnard.

24. Relying on the information in the contract documents, including the geotechnical information furnished by Kern River, SEDD prepared and submitted a proposal to Barnard to complete the drill crossings through the areas designated by Barnard.

25. SEDD and Barnard then entered into a subcontract under which SEDD was obligated to complete two HDD crossings.

26. SEDD has substantially completed the two HDD crossings in that both crossings have been put to their intended use by Barnard's customer, Kern River.

27. The subcontract provides in part: (1) Barnard must pay SEDD within seven days of receiving payment for SEDD's work from Kern River; and (2) Barnard assumed responsibility for correcting any subsidence resulting from SEDD's work.

28. Under the parties' subcontract, Barnard promised to pay SEDD for "Extra Work" including:

> Extra Work . . . occasioned by material changes in Plans and Specifications or project layout requiring additional work or materials of a different nature, kind and cost from that contemplated at the time of execution of this Agreement, or the performance of other or additional

6

>work incident to the completion of the facilities here involved, but not in contemplation of the parties at the time of execution of this agreement, or unrelated work at the same location.

29. The subcontract also provides for an extension of contract time if a "force majeure" event occurs, a term defined as "occurrences, factors or conditions not caused by the [claimant] and not reasonably contemplated by the parties, and which are beyond the control of Contractor or Company, and which by the exercise of due diligence such party shall not have been able to avoid or overcome."

30. While SEDD assumed risks on the project, including risks related to so-called "site conditions," those risks did not include the risk of encountering *subsurface* conditions that rendered drilling nearly impossible and inordinately expensive.

31. And while Barnard's contract generally disclaims all liability arising out of the contract documents (including liability for breach of contract!), and purports to bar any claims based on differing subsurface conditions, these disclaimers and exculpatory language do not override the contract's specific provisions promising payment for "Extra Work" and "force majeure" events. And the disclaimers are otherwise unenforceable as a matter of public policy.

32. During drilling operations, SEDD encountered **subsurface** conditions (not "site conditions") that were materially different from those indicated in the contract documents. These subsurface conditions could not have been reasonably anticipated by a similarly situated HDD contractor. The conditions included subterranean groundwater

7

flow, an earthquake fault line, and other unusual hydrogeological underground conditions.

33. SEDD submitted numerous requests for an equitable adjustment to the contract price and time as a result of the differing site conditions.

34. SEDD also repeatedly invoked the subcontract's dispute-resolution procedures, all to no avail.

35. To date, Barnard has denied all responsibility for any additional payments or time extensions owed to SEDD and has refused to participate in the subcontract's dispute procedures.

36. In addition, Barnard has demanded that SEDD not only correct subsidence for which Barnard is contractually responsible, but also assume professional design responsibility for that work.

37. After SEDD refused to act as both contractor and engineer—and after Barnard refused to pay SEDD over $945,000 for two HDD crossings that Kern River accepted and currently uses—Barnard wrongfully terminated the parties' subcontract and initiated a performance-bond claim against SEDD's surety, even though Barnard breached its contractual obligation to pay SEDD for the bond.

## First Claim for Relief
### (Kern River's Violation of Utah Code § 14-2-1)

38. SEDD incorporates by reference into this first claim for relief all other allegations of the complaint.

39. Under its subcontract with Barnard, SEDD has submitted invoices to Barnard totaling $945,898 for work performed. SEDD is also owed additional money under the subcontract, which amount has not been invoiced.

40. To date, Barnard has refused to pay SEDD for work it successfully completed and that Kern River, the project owner, is beneficially using.

41. Kern River knows that Barnard has not paid SEDD.

42. By statute (Utah Code § 14-2-1) Kern River was obligated to obtain a payment bond from Barnard for the purpose of securing payment to Barnard's subcontractors, including SEDD.

43. Kern River did not obtain the statutorily required payment bond.

44. Consequently, under Utah Code § 14-2-2, Kern River is liable to SEDD "for the reasonable value of the labor or service performed or the equipment or materials furnished up to but not exceeding the commercial contract price" of SEDD's subcontract with Barnard.

45. As a direct and proximate result of Kern River's statutory violations, SEDD has sustained general, special, consequential, and incidental damages in an amount to be established at trial, but not less than $945,000.

46. Under Utah Code § 14-2-2, the Court must award attorney's fees to the prevailing party in an action for failure to obtain a payment bond.

## Second Claim for Relief
### (Kern River's Negligent Misrepresentation)

47. SEDD incorporates by reference into this second claim for relief all other allegations of the complaint.

48. As owner of the project, Kern River had a pecuniary interest in SEDD's business transaction with Barnard.

49. Kern River was in a superior position to know material facts about the subsurface conditions pertinent to SEDD's work because Kern River had commissioned feasibility studies and geotechnical reports in designing the project's HDD crossings.

50. In electing to distribute geotechnical information, Kern River had an independent duty to SEDD, as a subcontractor bidding the project, to exercise reasonable care to supply accurate and complete information regarding project subsurface conditions.

51. Kern River carelessly or negligently made false representations about those subsurface conditions in that, among other things, Kern River affirmatively represented that, after inspecting the location where SEDD's work would be performed: (1) the soil encountered was consistent with published geology for the area; (2) gravelly soils were the only significant geotechnical risk to drilling operations; and that (3) it would be feasible to complete the crossing using the normal means and methods of HDD work and, therefore, would not be inordinately expensive and time-consuming to complete.

52. Kern River's statements about the project's subsurface conditions were false.

53. Kern River's misrepresentations about the project's subsurface conditions were made for the purpose of soliciting contractor bids for the project's HDD work, and circulated before SEDD entered into its subcontract with Barnard.

54. In sharing and referencing its geotechnical information when inviting bids, Kern River expected and intended that a prospective HDD contractor would rely on Kern River's subsurface information to formulate a price for its work and then act on Kern River's statements when selecting the means and methods for executing the work. At the very least, it was reasonably foreseeable that a prospective HDD contractor would rely on Kern River's representations.

55. SEDD did in fact reasonably rely on Kern River's negligent misrepresentations in bidding and, later, contracting with Barnard to perform the required work. Had SEDD known of the inaccuracies in Kern River's statements, it would have not bid on the work or, alternatively, would have bid a much higher price for the work.

56. As a direct and proximate result of Kern River's negligent misrepresentations, SEDD incurred additional costs to complete its work and sustained general, special, consequential, and incidental damages in an amount exceeding $2,000,000.

### Third Claim for Relief
### (Barnard's Breach of Contract)

57. SEDD incorporates by reference into this third claim for relief all other allegations of the complaint.

58. Barnard subcontracted a portion of its contract to SEDD.

11

59. SEDD has performed all of its duties and obligations under the subcontract, and all of the conditions precedent to Barnard's duties and obligations have occurred or have otherwise been performed. Barnard's performance is not excused by law.

60. Barnard materially breached the parties' subcontract by: (1) wrongfully defaulting and then terminating SEDD when SEDD's work was substantially complete; (2) failing to pay SEDD for "Extra Work" and other work not reasonably contemplated by the parties; (3) failing to pay SEDD for invoiced work within the subcontract's seven-day payment deadline; and (4) refusing to perform the subcontract in other respects, as SEDD may discover in this litigation.

61. As a direct proximate result of Barnard's material breaches, SEDD has sustained general, special, consequential, and incidental damages in the amount of more than $2,000,000.

62. SEDD is also entitled to prejudgment interest on its damages at the rate and as provided by law.

63. Under the parties' subcontract, SEDD is entitled to recover its attorney's fees.

### Fourth Claim for Relief
### (Barnard's Breach of Express and Implied Warranties)

64. SEDD incorporates by reference into this fourth claim for relief all other allegations of the complaint.

65. Barnard's affirmative representations about the project's subsurface conditions and the contract's requirement that SEDD accomplish its work through horizontal

directional drilling through areas designated by Barnard constituted warranties that the project plans and specifications were suitable for their intended purpose and, therefore, that SEDD could complete the HDD work using reasonable means and methods typical in the industry.

66. Barnard breached these warranties by, among other things, providing inaccurate and incomplete information, refusing to compensate SEDD for its additional costs, and refusing to grant a time extension for completing the project.

67. As a direct and proximate result of Barnard's breaches, SEDD has sustained general, special, consequential, and incidental damages in an amount of more than $2,000,000.

68. SEDD is also entitled to prejudgment interest on its damages at the rate and as provided by law.

69. Under the parties' subcontract, SEDD is entitled to recover its attorney's fees.

### Fifth Claim for Relief
### (Declaratory Judgment against Barnard)

70. SEDD incorporates by reference into this fifth claim for relief all other allegations of the complaint.

71. SEDD's subcontract with Barnard states:

> If a dispute arises related in any way to this SUBCONTRACT AGREEMENT the SUBCONTRACTOR agrees to submit such dispute for final and binding arbitration to the American Association or to follow the dispute resolution provisions as set forth in the MAIN CONTRACT, whichever is selected by the CONTRACTOR. If the

> CONTRACTOR selects arbitration under the SUBCONTRACT, such arbitration shall be governed by the AAA Construction Industry Rules. Said arbitration shall be held in Bozeman, Montana and shall be governed by Montana law.
>
> \* \* \*
>
> To the extent disputes between the CONTRACTOR and SUBCONTRACTOR involve in whole or in part disputes between the CONTRACTOR and the OWNER, at CONTRACTOR'S sole option, disputes between the CONTRACTOR and the SUBCONTRACTOR shall be decided in the same tribunal and in the same form as disputes between the CONTRACTOR and OWNER.

72. By contrast, Barnard's contract with Kern River—incorporated into Barnard's subcontract with SEDD—is governed by Utah law and provides that any lawsuit arising out of the contract must be instituted in a state or federal court located in Salt Lake City, Utah.

73. SEDD has repeatedly invoked the subcontract's dispute-resolution provisions. In response, Barnard has refused to perform its contractual obligation to participate in a dispute-resolution process.

74. Accordingly, Barnard has breached, abandoned, or waived any right to enforce the subcontract's dispute-resolution provisions, including those stipulating arbitration, choice-of-law, and forum selection.

75. Alternatively, Barnard's forum selection clause is unreasonable because it purports to require SEDD to litigate SEDD's payment claims against Barnard in Montana, while SEDD's payment claims against Kern River must be litigated in Utah.

76. Accordingly, there is a substantial, justiciable controversy between SEDD and Barnard, whose interests are adverse.

77. SEDD is entitled to a declaratory judgment adjudicating the unenforceability of these subcontract clauses.

78. A declaratory judgment is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties regarding the appropriate forum and choice of law for this action.

## Sixth Claim for Relief
### (Barnard's Violation of Utah Statutes)

79. SEDD incorporates by reference into this sixth claim for relief all other allegations of the complaint

80. Barnard has received $945,898 from Kern River as payment for SEDD's work on two crossings.

81. Although SEDD has earned this amount under the subcontract, Barnard is retaining the full amount "to guarantee . . . performance by [SEDD] of the [parties'] contract." *See* Utah Code § 13-8-5(1)(h).

82. Barnard's withholding of these "retention proceeds" is wrongful and constitutes a material breach of the subcontract.

83. Barnard's refusal to pay SEDD the amounts that are undisputedly owed, and Barnard's refusal to release retainage to SEDD, also violate Utah Code §§ 13-8-5, 58-55-602, and 58-55-603.

84. As a direct and proximate result of Barnard's breaches, SEDD has sustained general, special, consequential, and incidental damages in an amount to be established at trial but not less than $945,000.

85. SEDD is entitled to prejudgment interest on its damages at the rate and as provided by law. By statute, SEDD is also entitled to a penalty of 2% per month from the date Barnard's payment to SEDD was due. *See* Utah Code § 13-8-5(10)(b).

86. And SEDD is entitled to the reasonable costs of collection and attorney's fees.

## Jury Demand

87. SEDD demands a trial by jury of all issues in this case.

**Wherefore**, plaintiff Southeast Directional Drilling, LLC demands judgment against defendants Kern River Gas Transmission Company and Barnard Pipeline, Inc. as follows.

1. For general, special, consequential, and incidental damages against Kern River in an amount to be established at trial, but not less than $945,898.

2. For general, special, consequential, and incidental damages against Barnard in an amount to be established at trial, but not less than $2,000,000.

3. For prejudgment and statutory interest and penalties on SEDD's damages at the rate and as provided by law.

4. For attorney's fees.

5. For the costs of this action and all further relief to which SEDD is entitled.

Dated February 13, 2012.

        FABYANSKE, WESTRA, HART & THOMSON, P.A.
        Kyle E. Hart (MN Atty ID 159025)
        Theodore V. Roberts (MN Atty ID 31318X)
        800 LaSalle Ave. S., Suite 1900
        Minneapolis, MN 55402
        (612) 359-7600
        troberts@fwhtlaw.com


        /s/ Brad Holm
        Brad Holm (01521)
        HOLM WRIGHT HYDE & HAYS PLC
        10429 South 51st Street, Suite 285
        Phoenix, Arizona 85044
        (480) 961-0040
        bholm@holmwright.com

        Attorneys for plaintiff Southeast Directional Drilling, LLC